# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

————

Argued January 26, 2026         Decided July 17, 2026

No. 25-7008

RINAT AKHMETSHIN,
APPELLANT/CROSS-APPELLEE

v.

WILLIAM BROWDER,
APPELLEE/CROSS-APPELLANT

————

Consolidated with 25-7009

————

Appeals from the United States District Court
for the District of Columbia
(No. 1:18-cv-01638)

————

2

*Wesley Erdelack* argued the cause for appellant/cross-appellee.  With him on the briefs was *Michael Tremonte*.

*Aaron E. Nathan* argued the cause for appellee/cross-appellant.  With him on the briefs were *Michael J. Gottlieb* and *Noah Mussmon*.

Before: KATSAS, WALKER and PAN, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* WALKER.

WALKER, *Circuit Judge*: Sir William Browder, a citizen of the United Kingdom, sat for an interview in New York.  During the interview, Browder discussed a meeting that took place at Trump Tower in New York.  Browder said that the meeting was attended by a Russian "spy operator in Washington," D.C., named Rinat Akhmetshin.

The question presented is whether with that comment Browder "purposefully avail[ed]" himself of "the benefits and protection" of the District of Columbia such that he subjected himself to personal jurisdiction there.  *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. 351, 359–60 (2021).  We hold that he did not.

**I**

**A**

After the fall of the Soviet Union, Sir William Browder moved from his home country of the United States to Russia.

3

There, he founded Hermitage Capital Management, a hedge fund with more than $4 billion in assets.

From here the parties' narratives diverge. As Browder tells it, an auditor at Hermitage, Sergei Magnitsky, stumbled upon a tax-fraud scheme that "us[ed] the identities of several Hermitage portfolio companies." JA 457. The scheme involved a mix of "Russian government officials and members of organized crime." *Id.* To punish Magnitsky for bringing the scheme to light, Russian authorities whisked him away to a prison cell. There, Magnitsky perished.

In response, Browder directed his ire at the Russian Government. He began an all-out campaign, seeking to persuade people that Magnitsky had been murdered by Russian officials for uncovering the tax-fraud scheme.

Browder found a receptive audience, and in Congress no less. Congress passed the Magnitsky Act, "authorizing the President to impose sanctions against certain individuals who committed human rights violations, including those individuals responsible for the detention, abuse, or death of Mr. Magnitsky." JA 457–58.

At this point, Rinat Akhmetshin enters the story. He was rumored to be a spy and had allegedly engaged in "active measures" against the United States.[1] On Browder's telling,

---

[1] Active measures are an old Soviet tool, involving the use of "deception" "to influence" the "perceptions of individuals, governments," or the "public[]" and "to damage US foreign policy interests." *Active Measures Memo #8*, *in* Files of John Lenczowski at the Ronald Reagan Presidential Library 6 (1986), https://perma.cc/CF9P-GC2W.

4

Akhmetshin did so again by trying to turn popular opinion against the Magnitsky Act.

Akhmetshin sees things differently. According to Akhmetshin, he became convinced Browder's Magnitsky story was false. So he set out to refute it. For instance, he "organized a screening" at the Newseum in D.C. that "challenged the accuracy of" Browder's narrative and "the Magnitsky Act's findings." JA 460. He even formed an organization dedicated to improving the image of Russia that the Magnitsky Act had tarnished.

**B**

Today's case turns on what happened about a year later.

In July 2017, *NBC News* reported that about a year earlier, in June 2016, an unnamed "Russian-American lobbyist" and "former Soviet counterintelligence officer . . . suspected by some U.S. officials of having ongoing ties to Russian intelligence" had attended a meeting with Donald Trump Jr. and Russian lawyer Natalia Veselnitskaya at Trump Tower in New York City. JA 38. That same day, Akhmetshin confirmed that he was the lobbyist.

Browder then issued the following four statements, the last of which is the most relevant for our purposes:

> 1. *NBC News Tweet*. Browder tweeted out the *NBC News* article, adding: "Huge development in the Veselnitskaya/Trump Jr

5

story.  Russian GRU officer Rinat Akhmetshin was also present."  JA 37.[2]

2.    *AP Tweet*.    Browder tweeted out an *Associated Press* article in which Akhmetshin was described as a "former Soviet military officer" who "has been reported to have ties to Russian intelligence."  JA 45, 47.  Browder added that "Russian intelligence asset Rinat Akhmetshin confirm[ed] he was in the meeting with Trump Jr."  JA 44.

3.    *Business Insider Quote*.    In a *Business Insider* article, Browder was quoted as calling Akhmetshin "a member of Putin's secret police," and claiming that Akhmetshin had "ask[ed]" "the son of the future next president of the United States . . . to change US sanctions policy crucial to Putin."  JA 58.

4.    *CBS Statement*.    Browder appeared on *CBS This Morning* in New York City.  During the course of a six-minute interview focused on the Trump Jr. meeting, Browder claimed Akhmetshin was "by all accounts, some kind of shady former Soviet spy, current spy operator in Washington," who "organize[d] a full-on lobbying campaign hiring the top lobbyists, the top law firms, the top PR firms, to try to get rid of this Magnitsky Act."  CBS Mornings, *Bill Browder on past dealings with Russian lawyer in Trump Jr. meeting*, at 2:53–3:11 (YouTube,

---

[2] "GRU" "means *Glavnoye Razvedyvatel'noye Upravleniye*, the Main Intelligence Directorate of the Soviet foreign military intelligence agency."  Br. for Plaintiff-Appellant/Cross-Appellee vi.

6

> July 18, 2017), https://www.youtube.com/watch?v=fUUBCVJ xMP4.

Akhmetshin sued, asserting a single claim for defamation based on these four statements. Browder moved to dismiss for lack of personal jurisdiction and for attorney's fees under the D.C. Anti–SLAPP Act.

The district court held that it lacked personal jurisdiction and dismissed the case. It also held that no award of attorney's fees was proper and declined to award them.

We affirm.

## II

The Federal Rules of Civil Procedure require this court to act like a D.C. local court in assessing personal jurisdiction. *See* Fed. R. Civ. P. 4(k)(1)(A); *see also id.* 81(d)(2). For D.C. local courts, the minimum-contacts test applies. Under that test, Browder is not subject to personal jurisdiction in D.C.

### A

#### 1

D.C. local courts must apply the minimum-contacts test from *International Shoe Co. v. Washington*, 326 U.S. 310 (1945). That conclusion follows from both the Court's recent precedent in *Fuld v. Palestine Liberation Organization*, 606 U.S. 1 (2025), and our own precedents.

Per *Fuld*, personal jurisdiction concerns the authority of the court. *See id.* at 16–17. The scope of the court's authority, in turn, depends on "the corollary authority" of the Government

7

whose sovereign authority the court wields. *Id.* at 15. Thus, the rules of personal jurisdiction depend on a "sovereign-by-sovereign . . . analysis." *Id.* at 16.

The *International Shoe* test for state court exercises of personal jurisdiction "emerged" from that sovereign-by-sovereign analysis. *Id.* at 14. As the Court explained, "[s]tate sovereign authority is bounded by the States' respective borders." *Id.* Thus, "the authority of *state* courts" is territorially constrained "consonant with" the "constrained sovereign spheres" of the States whose sovereign authority those courts wield. *Id.* at 16; *see also id.* at 14. That means a state court may generally exercise personal jurisdiction over an out-of-state defendant only if the suit arises out of or relates to contacts that the defendant creates with the State. *See Ford*, 592 U.S. at 359–60. That test, the Court has explained, "and in particular, the requirement that a defendant have minimum contacts with the forum State," is designed to "ensure that the States, through their courts, do not reach out" too far beyond their territorial "limits." *Fuld*, 606 U.S. at 14.

The sovereign-by-sovereign analysis dictates a different rule for courts of the United States. After all, "the United States is a distinct sovereign" with distinct sovereign authority. *Id.* at 16 (quoting *J. McIntyre Machinery, Ltd. v. Nicastro*, 564 U.S. 873, 884 (2011) (plurality opinion)). Unlike the States, "the Federal Government" wields "both nationwide and extraterritorial authority." *Id.* at 15.

The federal courts, imbued with the sovereign authority of the Federal Government, possess a "corollary authority" that is "nationwide and extraterritorial." *Id.* Thus, the territorial limits *International Shoe* imposes "on the authority of *state* courts" cannot apply to federal courts. *Id.* at 16. Although we need not delineate the precise contours of the test for federal

8

courts, suffice it to say that federal court authority to hale in out-of-state defendants must be "nationwide and extraterritorial" consistent with the "distinct territorial reach of the Federal Government's sovereign power." *Id.* at 15–16.

Those distinctions guide us here. The District of Columbia does not wield "both nationwide and extraterritorial authority." *Id.* at 15; *see also Financial Oversight and Management Board for Puerto Rico v. Aurelius Investment, LLC*, 590 U.S. 448, 476 (2020) (Thomas, J., concurring in the judgment) ("The powers vested in territorial governments are distinct from the powers of the National Government."). Nor do D.C. local courts.

Those local courts wield only the local, territorial power of the District of Columbia. As the Supreme Court has explained, the D.C. local courts are "wholly separate" from the federal courts and "designed primarily to concern [themselves] with local law and to serve as a local court system for a large metropolitan area." *Palmore v. United States*, 411 U.S. 389, 408 (1973); *see also id.* at 407 (explaining that D.C. courts are "strictly local courts"); *id.* at 409 (explaining that the D.C. courts have "functions essentially similar to those of the local courts found in the 50 States of the Union"). That explains why the judges of those courts do not receive the protections of Article III — they do not wield the "judicial Power *of the United States*," U.S. Const. art. III, § 1 (emphasis added), but rather the local, territorial authority of the District of Columbia. *Trump v. Slaughter*, No. 25-332, 2026 WL 1855612, *20 n.9 (2026); *see also Aurelius*, 590 U.S. at 476 (Thomas, J., concurring in the judgment).[3]

"That distinction makes a difference" for purposes of personal jurisdiction. *Fuld*, 606 U.S. at 16. Consistent with

---

[3] To be sure, in one sense, the D.C. courts, like territorial courts, "derive their authority" from the Federal Government. *Fuld*, 606

9

the fact that D.C. courts have a "more constrained sovereign sphere[ ]," *id.*, our circuit has long assessed exercises of personal jurisdiction by D.C. local courts under the more restrictive *International Shoe* test applicable to state courts, whose authority is likewise territorially restricted. *See, e.g.*, *Thompson Hine, LLP v. Taieb*, 734 F.3d 1187, 1189 (D.C. Cir. 2013). Thus, a defendant may be haled into a local D.C. court on the same grounds that allow him to be haled into a state court — by satisfying the minimum-contacts test of *International Shoe*. *See id.*[4]

**2**

Akhmetshin disagrees with this analysis. As he notes, the constitutional provision governing exercises of personal

U.S. at 16; *see also* William Baude, *Adjudication Outside Article III*, 133 Harv. L. Rev. 1511, 1531 (2020). In some contexts, that matters. *See Puerto Rico v. Sanchez Valle*, 579 U.S. 59, 62 (2016) (holding that Puerto Rico is not a separate sovereign from the United States for Double Jeopardy purposes "because the oldest roots of Puerto Rico's power to prosecute lie in federal soil"). But what matters here is that D.C. local courts do not wield the Federal Government's "nationwide and extraterritorial" sovereign "authority." *Fuld*, 606 U.S. at 15. So they do not get to take advantage of the "more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.* at 16.

[4] Akhmetshin says Congress exercised its powers under the Enclave Clause to pass the long-arm statute for D.C. *See* Tr. of Oral Arg. 9 (counsel for Akhmetshin) (agreeing that "it's the Enclave" Clause that Congress "was exercising when it passed the long-arm statute"); U.S. Const. art. I, § 8, cl. 17 (authorizing Congress "[t]o exercise exclusive Legislation . . . over such District (not exceeding ten Miles square)" that should "become the Seat of Government"). But as our court has long held, when Congress acts under the Enclave Clause, "it acts 'in like manner as the legislature of a State.'" *Milton S. Kronheim & Co. v. District of Columbia*, 91 F.3d 193, 199 (D.C. Cir.

10

jurisdiction by D.C. local courts is the same one that governs exercises of personal jurisdiction by federal courts: the Fifth Amendment. *See Bulluck v. Washington*, 468 F.2d 1096, 1100 & n.9 (D.C. Cir. 1972). Because the Fifth Amendment applies, Akhmetshin argues, we should apply *Fuld*'s "more flexible jurisdictional inquiry," cabining *International Shoe*'s jurisdictional inquiry to cases involving the Fourteenth Amendment. Response and Reply Br. for Plaintiff-Appellant/Cross-Appellee 1 (quoting *Fuld*, 606 U.S. at 16).

We disagree. *Fuld* did not purport to adopt a global Fifth Amendment test for personal jurisdiction. Any seemingly broad statements in that case must be "read as referring in context to circumstances similar to the circumstances then before the Court and not referring to quite different circumstances that the Court was not then considering." *Olivier v. City of Brandon*, 607 U.S. 552, 565 (2026) (quoting *Turkiye Halk Bankasi AS v. United States*, 598 U.S. 264, 278 (2023)); *see also Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821). And the Court made clear what circumstance it was considering: the exercise of personal jurisdiction "by a *federal* court." *E.g.*, *Fuld*, 606 U.S. at 11 (addressing "the question" the Court had long "expressly reserved": "whether the *Fifth* Amendment imposes the same restrictions on the

---

1996) (quoting *Gibbons v. District of Columbia*, 116 U.S. 404, 407 (1886)); *cf. Aurelius*, 590 U.S. at 474 n.1 (Thomas, J., concurring in the judgment) ("There is no meaningful distinction" "between power exercised pursuant to territorial laws enacted by Congress and power exercised pursuant to territorial laws enacted by a territorial legislature"). So if anything, Congress's exercise of its Enclave Clause power would seem to bolster the analogy between D.C. local courts and state courts.

11

exercise of personal jurisdiction by a *federal* court" as the Fourteenth Amendment).

Moreover, *Fuld*'s reasoning mirrors our reasoning above. *Fuld* rejected *International Shoe* not primarily because the Fifth Amendment was involved, but because a categorically different sovereign was involved.  *See id.* at 16.  Because of "the distinct territorial reach of the Federal Government's sovereign power" — and the distinct territorial reach of the federal "courts" that "derive their authority" therefrom — it "ma[de] little sense to mechanically import the limitations that the Fourteenth Amendment imposes on the authority of *state* courts."  *Id.*  So *Fuld*'s reasoning turned on the very "sovereign-by-sovereign analysis" we have conducted here. *Id.* (ellipsis omitted).

**B**

Akhmetshin offers two theories to satisfy *International Shoe*'s minimum-contacts test: (1) Browder is subject to jurisdiction in D.C. because the effects of Browder's allegedly defamatory statements were felt by Akhmetshin in D.C.; and (2) even disregarding the specific statements at issue, Browder's other contacts with D.C. are related enough to Akhmetshin's defamation claim to ground personal jurisdiction.  The first theory relies on *Calder v. Jones*, 465 U.S. 783 (1984).  The second relies on *Ford*.  Both fail.

**1**

Akhmetshin's first theory turns fundamentally on Browder's statement during his interview with *CBS This Morning* that Akhmetshin is a "spy operator in Washington." Akhmetshin argues that with that comment Browder subjected

12

himself to jurisdiction in D.C.  As support Akhmetshin relies on the "effects test" announced in *Calder*.

**a**

*Calder*'s "effects test" cannot ground personal jurisdiction.

In *Calder*, the *National Enquirer* published an article that said Oscar-winning actress Shirley Jones had an alcohol problem.  Its title announced: "Husband's Bizarre Behavior" (referring to actor and comedian Marty Ingels) "Is Driving Shirley Jones to Drink."  John South, *Husband's Bizarre Behavior Is Driving Shirley Jones to Drink*, Nat'l Enquirer (Oct. 9, 1979), https://perma.cc/QF79-LBYU.  The alcohol, the article alleged, was impairing Jones's work.  According to "an inside source," Jones was "pour[ing] down vodka so fast that at first the crew thought she was drinking water."  *Id.*  "By 3 in the Afternoon," the article reported in large, bolded font centered on the front page, "She's a Crying Drunk."  *Id.*

Jones brought suit in California state court against John South and Iain Calder, the respective writer and editor of the story, "both of whom worked for the National Enquirer at its headquarters in Florida."  *Walden v. Fiore*, 571 U.S. 277, 286–87 (2014); *see also Calder*, 465 U.S. at 784–86.  The Court held that the defendants were subject to personal jurisdiction in California.  In language that many courts would later latch onto, the Court said that jurisdiction was "proper in California based on the 'effects' of" the defendants' "Florida conduct in California."  *Calder*, 465 U.S. at 789 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297–98 (1980)).  With that the "effects test" was born.

*Walden* has since clarified the limits of *Calder*'s "effects test."  As *Walden* made clear, *Calder* must be understood in

13

light of fundamental principles of personal jurisdiction. Those include that the defendant *himself* must create contacts with the forum *itself*, *see Walden*, 571 U.S. at 284–85, and that the defendant forms minimum contacts only when he "purposefully avails [him]self of the privilege of conducting activities within the forum State," *Ford*, 592 U.S. at 359 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)); *see also id.* at 360 (explaining that "specific jurisdiction" is "founded . . . on an idea of reciprocity between a defendant and a State," permitting the State to hale the defendant into court only when the defendant purposefully avails himself of "the benefits and protection of" the State's "laws"); *Walden*, 571 U.S. at 288 n.7 (explaining how *Calder* sought to cohere its holding with this fundamental principle). In light of these principles, *Walden* interpreted *Calder* as holding that the defendants in *Calder* formed jurisdictionally significant contacts in California because California was "the focal point both of the story and of the harm suffered." *Walden*, 571 U.S. at 287 (quoting *Calder*, 465 U.S. at 789). And it provided some explanation of how to cohere this rule with the rule that a defendant's contacts with the forum state must be "sufficiently purposeful." *Id.* at 288 n.7. The *Calder* defendants had "'expressly aimed' 'their intentional, and allegedly tortious, actions' at California because they knew the National Enquirer 'ha[d] its largest circulation' in California, and that the article would 'have a potentially devastating impact' there." *Id.* (quoting *Calder*, 465 U.S. at 789–90). They had thus purposefully availed themselves of California.

Under *Walden*'s understanding of *Calder*, Browder did not form jurisdictionally significant contacts with D.C. Even leaving aside the requirement that the forum be the focal point

14

of the harm, D.C. was not *a* — let alone *the* — focal point of the story.

Akhmetshin puts great weight on Browder's statement to *CBS This Morning* that Akhmetshin is a "current spy operator in Washington." But a single, off-hand remark during a six-minute interview bears little weight.

That is especially true when put in context. Browder's two tweets and his *Business Insider* comment all came out just a few days before the *CBS This Morning* interview, and all focused on the Trump Jr. meeting in New York without so much as mentioning D.C. So did nearly every second of Browder's six-minute *CBS This Morning* interview. And even as Browder made the disputed comment during the interview, *CBS This Morning* continued to hang a banner under Browder referring to the *New York* meeting: "BROWDER ON TRUMP JR. MEETING WITH RUSSIAN LAWYER." CBS Mornings, *supra*, at 2:53–3:11.

Thus, in context, Browder's "current spy operator in Washington" comment was not part of some grand narrative about Akhmetshin's acts in D.C. Nor was the comment its own mini-story about D.C. events that can be separated from the narrative about the New York meeting. Browder's comment was the introduction of Akhmetshin as a character into the broader narrative about a meeting that happened 200 miles away in New York. All the while, Browder's focus remained the New York meeting.

Compare *Calder*. *Calder* involved a Hollywood story through and through. Or as the Court put it, there were "various facts that gave the article a California focus." *Walden*, 571 U.S. at 288. Indeed, nearly every paragraph implicated California. *See* Tr. of Oral Arg. 20 (discussing the article). Thus, we may leave to one side the fact that the defendants in *Calder* "relied

15

on phone calls to 'California sources' for the information in their article." *Walden*, 571 U.S. at 287 (quoting *Calder*, 465 U.S. at 788).[5]  The entire "story" they wrote focused on "the plaintiff's activities in California." *Id.*  It did not involve one off-hand remark implicating the forum.  So *Calder* cannot support personal jurisdiction here.

**b**

Akhmetshin reads *Walden* and *Calder* differently.  He relies on the following sentence from *Walden*: "[B]ecause publication to third persons is a necessary element of libel, . . . the defendants' intentional tort actually occurred *in* California," *id.* at 288, i.e., the place where the "scandalous . . . newspaper article" was "communicated . . . and read . . . and understood," *id.* at 287.  Shorn from context, this statement might be read to say a defendant forms a jurisdictionally relevant "contact" anywhere a potentially defamatory statement is communicated, read, and understood.[6]  On that theory, given the global reach of modern media, Browder may well have formed a jurisdictionally relevant contact in Mongolia.

We need not linger on the familiar notion that "a single sentence" in a judicial opinion "summariz[ing] prior . . . cases"

---

[5] Akhmetshin requests jurisdictional discovery on Browder's sources.  We deny that request.  Our analysis does not depend on Browder's sources.  And if it did, we would still deny the request because Akhmetshin made this request for the first time in this court.

[6] To be sure, Akhmetshin does not go quite so far.  He finds ways to limit his theory. *See* Tr. of Oral Arg. 26 (counsel for Akhmetshin) (seemingly limiting the potential sweep of this statement by still requiring that the comments be "widely circulated in the" forum and that the plaintiff "live[] and work[]" there).  But the proper limits are found by reading the sentence in context, as we do.

16

can only bear so much weight. *Arkansas Game & Fish Commission v. United States*, 568 U.S. 23, 34–35 (2012). Also on the nose is another familiar notion: that every sentence in a judicial opinion "must be read with a careful eye to context." *National Pork Producers Council v. Ross*, 598 U.S. 356, 374 (2023).

That knocks out Akhmetshin's theory. In context, the one sentence in *Walden* reinforces, rather than refutes, our analysis.

The Court in *Walden* was simply explaining how to cohere *Calder* with the principle described above: that the defendant must create contacts with the forum itself, not just "persons who reside there." *Walden*, 571 U.S. at 285; *see also id.* at 284–85. The *Calder* defendants were "connected" to California "largely" because of "the nature of the libel tort." *Id.* at 287. The nature of that tort, *Walden* explained, is such that the "libel is generally held to occur wherever the offending material is circulated." *Id.* at 288 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 777 (1984)). In *Calder*, the offending material circulated in California. So, in one sense, the libel in *Calder* "actually occurred *in* California." *Id.* That helped explain why "the 'effects' caused by the defendants' article — *i.e.*, the injury to the plaintiff's reputation in the estimation of the California public — connected the defendants' conduct to *California*, not just to" people "who lived there." *Id.*

Even so, the Court did not say that that connection alone sufficed. It was "[t]hat connection, *combined with the various facts that gave the article a California focus*," that "sufficed to authorize the California court's exercise of jurisdiction." *Id.* (emphasis added).

Thus, to ground personal jurisdiction, the Court reiterated the need for forum-centric harm and a forum-centric narrative.

17

So when put in context, the sentence Akhmetshin points to about the nature of the libel tort reaffirms our analysis.

**2**

Next, Akhmetshin tries another theory. He argues Browder has several D.C. contacts that at least "relate to" this case. Thus, Akhmetshin argues, Browder is subject to personal jurisdiction in D.C. under *Ford*.[7] Again, we disagree.

*Ford* involved two appeals, one from Montana state court and one from Minnesota state court. In the Montana case, Montana resident "Markkaya Gullett was driving her" 1996 Ford Explorer "near her home" in Montana "when the tread separated from a rear tire. The vehicle spun out, rolled into a ditch, and came to rest upside down. Gullett died at the scene of the crash." *Ford*, 592 U.S. at 356. In the Minnesota case, Adam Bandemer was riding "in his friend's" 1994 "Crown Victoria" when "his friend rear-ended a snowplow." *Id.* The "air bag failed to deploy," and Bandemer "suffered serious brain damage." *Id.* The representative of Gullett's estate sued Ford in Montana, and Bandemer sued in Minnesota.

Both faced a problem, though. Ford had not designed, manufactured, or sold the particular vehicles in the forum States. For all the record showed, the cars reached those States only through the "unilateral activity of" actors other than Ford. *World-Wide Volkswagen*, 444 U.S. at 298 (quoting *Hanson*, 357 U.S. at 253) (explaining that is not enough to ground minimum contacts); *see also Ford*, 592 U.S. at 356–57. So if specific jurisdiction required proof that Ford's forum conduct

---

[7] Of course, Akhmetshin would also need to satisfy the five-factor reasonableness test of *World-Wide Volkswagen*. *See* 444 U.S. at 292 (laying out this test). We put that to one side because we disagree that Browder's contacts "relate to" the present suit.

18

caused the plaintiffs' claims, jurisdiction would not lie in the forum States.

The Supreme Court thought that was not dispositive. *See Ford*, 592 U.S. at 361. As for contacts in the fora, Ford had plenty. *Id.* at 364–65. Then came *Ford*'s doctrinal development. Even if Ford's in-state contacts did not cause the claims, those contacts still "*relate[d] to*" the claims in the relevant sense. *Id.* at 362 (explaining that specific jurisdiction requires only "that the suit arise out of *or relate to* the defendant's contacts with the forum" and "the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing" (quotation omitted)); *see also id.* at 365. That was enough, *Ford* held.

The sense in which *Ford* used "relate to" matters here. *Ford* rejected an "anything goes" approach to personal jurisdiction, emphasizing that "the phrase 'relate to' incorporates real limits." *Id.* at 362. Thus, to satisfy *Ford*, the plaintiff must identify a "strong relationship" between the defendant's contacts with the forum and "the litigation." *Id.* at 365 (quotation omitted).

Ford met that standard because it "had systematically served a market in" the forum States "for the very" same products "that the plaintiffs allege[d] malfunctioned and injured them in those States." *Id.* Generalizing a bit, we may detect two features *Ford* makes relevant to the relatedness inquiry. First, the defendant must have "systematic contacts" in the forum; "isolated or sporadic" contacts do not suffice. *Id.* at 366 & n.4. Thus, in *Ford*, it mattered that Ford advertised in the fora "[b]y every means imaginable"; sold innumerable cars at dozens of dealerships in the fora; "maintain[ed] and repair[ed]" cars in the fora; "distribute[d] replacement parts" in the fora; and "ma[d]e" oodles of "money" in the fora. *Id.* at

19

365.  Second, whatever systematic contacts the plaintiff can point to must involve conduct extraordinarily similar to the defendant's conduct that gave rise to the claim, conduct that could easily have given rise to nigh-identical claims in the forum.  Thus, in *Ford*, the Court focused on Ford's having "systematically served a market" in the forum for the *precise product* that caused the in-state injury, thus opening Ford up to suits when the very "car models Ford so extensively market[ed]" in the fora should "malfunction[] there."  *Id.* at 366, 368.

Akhmetshin's reliance on *Ford* stretches "relate to" beyond its limits.  Akhmetshin alleges that Browder's "prior contacts" with D.C. "are generally related" to the litigation because they involve "Mr. Browder cultivating a career and a reputation as an expert on U.S.-Russia relations."  Tr. of Oral Arg. 11.  That is not *Ford* relatedness.  It is mere thematic relatedness.

Moreover, Akhmetshin can point to few, if any, contacts Browder has with D.C. that involve conduct remotely similar to the conduct that gave rise to this claim.  We need not tarry on imponderables like whether selling 1995 Crown Victorias is sufficiently similar to selling 1994 Crown Victorias or selling "the Explorer base model" is sufficiently similar to selling "the Explorer XLT."  Stephen Sachs, *Originalism and Personal Jurisdiction: Some Hard Questions*, Volokh Conspiracy (Dec. 9, 2020), https://perma.cc/5P3F-27UY?type=image.  Here, we need explain only that chatting about U.S.-Russia relations at "think tank events" is not remotely like making disparaging comments about D.C. residents over mass media.  JA 347 (Akhmetshin's Opposition to Browder's Motion to Dismiss).  Whatever *Ford*'s "same product" concept, it does not contemplate such dissimilar activity counting for relatedness purposes.    Thus,   the   "isolated   or   sporadic"   contacts

20

Akhmetshin points to with at best remote similarity to the conduct underlying this litigation, *Ford*, 592 U.S. at 366 n.4, do not forge the requisite "strong relationship among the defendant, the forum, and the litigation," *id.* at 365 (quotation omitted).

## III

Finally, Browder argues he is entitled to attorney's fees under the D.C. Anti–Strategic Lawsuits Against Public Participation Act. We disagree. As relevant here, a party is entitled to attorney's fees under the Anti–SLAPP Act only if he prevails on a motion under § 16-5502 of the D.C. Code. Browder did not prevail on a motion under § 16-5502. Thus, he is not entitled to attorney's fees under the Anti–SLAPP Act.

Start with the legal background. Like many jurisdictions, D.C. has an Anti–SLAPP Act that "seeks to protect speakers from lawsuits 'filed by one side of a political or public policy debate aimed to punish or prevent the expression of opposing points of view.'" *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 237 (D.C. Cir. 2021) (quoting *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213, 1226 (D.C. 2016)).

The Anti–SLAPP Act is codified in §§ 16-5501 through 16-5505 of the D.C. Code, but the provisions relevant to this case are §§ 16-5502 and 16-5504. Section 16-5502 provides "a special motion to dismiss" procedure for claims "arising from an act in furtherance of the right of advocacy on issues of public interest." D.C. Code § 16-5502(a). Section 16-5504 provides that a "court may award" attorney's fees to "a moving

21

party who prevails, in whole or in part, on a motion brought under § 16-5502." *Id.* § 16-5504(a).

Browder did not prevail on a motion brought under § 16-5502.

The conclusion seems intuitive. Browder prevailed on a motion brought under Federal Rule of Civil Procedure 12(b)(2). That is wholly unlike a motion under § 16-5502. For instance, § 16-5502(c)'s stay of discovery does not apply to a 12(b)(2) motion. And it is bedrock law that when a federal court grants a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, it must dismiss without prejudice. *See Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1869) ("Without jurisdiction the court cannot proceed at all in any cause."); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) ("Personal jurisdiction . . . is an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." (cleaned up)). But under § 16-5502(d), dismissal must "be with prejudice." D.C. Code § 16-5502(d); *see also* Tr. of Oral Arg. 40 (counsel for Akhmetshin) (noting that the Anti–SLAPP Act requires with-prejudice dismissal). So Browder did not prevail on a motion under § 16-5502; he prevailed on a motion under Rule 12(b)(2).

That conclusion is supported by our precedent.

Specifically, in *Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015), our court addressed the "choice-of-law problem" federal courts face whenever plaintiffs bring state-law claims in federal court: "The Rules of Decision Act directs federal courts to apply state substantive law, leaving federal law to cover the rest." *Berk v. Choy*, 607 U.S. 187, 192 (2026) (citing 28 U.S.C. § 1652). But "determining whether a state law is substantive" is tricky, requiring courts to wade into

22

the "murky waters" of *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). *Berk*, 607 U.S. at 192 (quotation omitted). "Yet when a Federal Rule of Civil Procedure is on point, a federal court" may sail over *Erie* "altogether." *Id.* In that case, the Federal Rule — provided it "really regulates procedure" — displaces contrary state law. *Id.* at 198; *see also id.* at 192; 28 U.S.C. § 1652 (providing that even state substantive law does not apply if a statute "otherwise require[s] or provide[s]"); *id.* § 2072(a) (providing that the Supreme Court may "prescribe general rules of practice and procedure . . . for cases in the United States district courts . . . and courts of appeals").[8]

*Abbas* held that the Federal Rules displaced § 16-5502's special motion to dismiss procedure. Per *Abbas*, a federal court "should not apply a state law" if "a Federal Rule of Civil Procedure answers the same question as the state law," at least if they answer the question differently. *Abbas*, 783 F.3d at 1333 (cleaned up); *see also id.* at 1335 n.3. The Federal Rules and the Anti–SLAPP Act "answer the same question about the circumstances under which a court must dismiss a case before trial," but they answer that question "differently." *Tah*, 991 F.3d at 239. Under the Federal Rules, for example, the burden is on the movant-defendant to win a motion to dismiss under Rule 12(b)(6), *see Cohen v. Board of Trustees of the University of the District of Columbia*, 819 F.3d 476, 481 (D.C. Cir. 2016), but under the Anti–SLAPP Act the burden is on the nonmovant-plaintiff to demonstrate that the claim is likely to succeed on the merits, *see Tah*, 991 F.3d at 239. That "additional hurdle" set up by the Anti–SLAPP Act for a

---

[8] It is worth noting what the Supreme Court recently reiterated: The Court has "rejected every statutory challenge to a Federal Rule that has come before" it. *Berk*, 607 U.S. at 199. Regardless, no one challenges the validity of any Federal Rule here.

23

plaintiff means that the Anti–SLAPP Act "conflicts with the Federal Rules," and it cannot apply. *Id.* at 238.

That defeats Browder's request for attorney's fees. Because § 16-5502 does not apply in federal court, Browder could not "prevail[] . . . on a motion brought under § 16-5502." D.C. Code § 16-5504(a). And by its terms, the Anti–SLAPP "Act does not purport to make attorney's fees available to parties who obtain dismissal by other means, such as under Federal Rule 12(b)[(2)]." *Abbas*, 783 F.3d at 1337 n.5. So the district court rightly refused to award Browder attorney's fees after Browder obtained dismissal under Rule 12(b)(2).

Nonetheless, Browder argues he did prevail, or should have prevailed, on a motion under § 16-5502. He says that two D.C. Court of Appeals cases, *Mann* and *American Studies Association v. Bronner*, 259 A.3d 728 (D.C. 2021), have undone *Abbas*. But Browder mistakes the import of those cases.

Start with *Mann*. *Mann* held that the "D.C. Anti–SLAPP Act's likelihood of success standard . . . simply mirror[s] the standards imposed by Federal Rule 56." *Tah*, 991 F.3d at 238 (quoting *Mann*, 150 A.3d at 1239 n.32 (quotation omitted)). Even after *Mann*, though, our court adhered to *Abbas*, because "the special motion to dismiss" remained "different from" the Federal Rules in several "respects." *Id.* at 239. So *Mann* provides Browder no support.

Now turn to *American Studies*. It held simply that victory for a defendant under local D.C. Rule 12(b)(6) entails victory under § 16-5502. Thus, a court "must grant" an Anti–SLAPP motion in that scenario. *American Studies*, 259 A.3d at 750; *see also id.* at 740. But Browder has *not* prevailed under local D.C. Rule 12(b)(6). And nowhere did the D.C. Court of Appeals interpret the term "§ 16-5502" to mean "§ 16-5502 or

24

Federal Rule 12(b)(2) or any other provision the defendant might win under."

Browder also argues that we should treat as preempted any parts of § 16-5502 that conflict with the Federal Rules as applied to this particular case. Then, invoking D.C. severability doctrine, Browder argues that *American Studies* made clear that § 16-5502 can exist independently of any of those preempted applications or provisions. Thus, per Browder, a version of § 16-5502 is left over for federal purposes that perfectly mirrors the Federal Rules. That version of § 16-5502 can, and must, apply in federal court.

Leaving aside a host of complications that theory raises, it fails because it overreads *American Studies* and underreads *Abbas*. As to *American Studies*, that case says nothing about § 16-5502's severability as a matter of D.C. law. As to *Abbas*, the case's determination that § 16-5502 cannot apply in federal court had nothing to do with § 16-5502's severability. And whatever relevance ordinary federal preemption doctrine might have to a choice-of-law question like this one, the D.C. Court of Appeals's decision in *American Studies* could not, and did not, say anything about federal preemption doctrine that might override our court's decision in *Abbas*.

*    *    *

Browder is not subject to personal jurisdiction in D.C. But Browder's victory under Rule 12(b)(2) does not provide a basis for an award of attorney's fees under D.C.'s Anti–SLAPP Act. Thus, we affirm the judgment below. We also deny Akhmetshin's request for jurisdictional discovery.

*So ordered.*